The opinion of the Court was delivered by
Withers, J.
By a paper called an advertisement, issued from the office and by authority of the South-Carolina Railroad Company, at Charleston, and bearing the double dates of October 22 and November 2, 1849, published in one or more newspapers, under the head, “ Freight on cotton from Chattanooga, Tenn., to Charleston, South-Carolina,” notice was given as follows : “ By a recent arrangement between the South-Carolina, the Georgia and Western and Atlantic Railroads, a through ticket for freight on cottun has been made from Chattanooga, Tenn., to Charleston, S. C., at the rate of 65 cents per 100 lbs. It is highly necessary, in order to insure correctness in the transaction of this business, that the agent of the South-Carolina Railroad, at Hamburg, should be aware of the number of bales and marks of each shipment. Shippers are therefore earnestly requested to take duplicate receipts; one of which must, in all cases, be forwarded, per mail, to the above-named agent, in order to fix responsibility on this Company. With these precau *208 tions, the business can and will be transacted mutually satisfactory to'all concerned. The Roads pledge themselves to give all practicable despatch to cotton entrusted to them for transportation.”
Subsequent to this notice, and the evidence leaves no room to question, in pursuance of it, receipts or contracts of af-freightment were executed and delivered to shippers oí lots of cotton, dated, for the most part, at the Transportation Depart-merit, Chattanooga Depot, of the Western and Atlantic Railroad Company — some at Dalton, hy persons who subscribed them as “agents,” without more. The bales were described therein, as usual in such transactions — in some the order and condition was stated' to be good — in others nothing was stated on that subject — in one that the cotton was wet — all acknowledging consignment to the parties in Charleston who are litigant with the South-Carolina Railroad Company, in these cases.
Much of this cotton was found seriously damaged upon its arrival in Charleston, precisely when, where, or how, is not conclusively ascertained, but, there is good ground to believe, before it reached the custody of the said Railroad Company. These actions involve in the aggregate, heavy reclamation demanded of that Company and fixed upon it by the verdicts rendered. The liability is charged in the declarations, first, -as against a resident copartner, the two other Railroad copartners being beyond this jurisdiction; second, as against a resident joint-contractor. The claimants have abandoned the ground of partnership and rest their cases upon that of joint contract on-the part of the three roads.
This Court has not adjudged the question of partnership, since it has not been fully discussed, but has considered the position of joint-contract as that relied on by the appellees, and it is found to be one upon which the cases can he decided.
The course of dealing among the three roads, touching the business growing out of the “ arrangement” already set forth, was thus : Expenses resting on the cotton received at Chattanooga for transportation to Charleston were paid at the former *209 & and Ham-place by the Western and Atlantic Railroad, which terminated at Atlanta; at that point, the Georgia Railroad took custody and gave credit to the other road for expenses paid and freight earned by it — that is, some proportion of the 65 cents per hundred for the entire transit. At Hamburg, the South-Carolina Railroad took custody and entered a like credit to the Western and Atlantic and the Georgia Roads, and having transported the cotton to Charleston, received the entire freight, holding a duplicate bill of affreightment; and debited shippers OEjtfeeiíF&S?: signees with the aggregate expenses, including (itM the porterage, by drays, necessary between Augus burg. It has not appeared in what several proportic freight was partitioned among the three roads, nor -__ was a secret contract among them as to the contingetacjkslcS? fkfr'-®' business. A statement on the part of appellants re witness to have said that the Companies were not liable to eaí other for profits or losses. It is in evidence, that the South-Carolina Railroad Company did account here for what is called “ short delivery,” but whether such reimbursement was paid out of the aggregate sum of freight, its own share included, or whether it was entered as a debit to one or other road, and as an offset to its share of freight, accordingly as the loss was attributed to a particular one, has not been made to appear.
If the case rested exclusively upon the receipts executed at Chattanooga, the joint contract among the three roads would not be established. That evidence, alone, would import no more,- than that the Western and Atlantic Road had undertaken to deliver the specified goods, upon the responsibilities of the-law of common carriers, at Charleston. That the agency of others was indispensable, would not dictate a contrary conclusion, even although the further fact should be added, that an entire freight for the whole line of transit should be receivable, in solido, by the South-Carolina Company, and be divisible among those engaged in the transportation, as several and not joint earnings.
The case would become stronger to warrant the inference of *210 a joint undertaking, a joint interest, and, therefore, a joint liability, (if not a partnership, quoad hoc,) if we add the considerations, supposed to be sufficiently potent and notorious to be fairly introduced, to wit: that the upper railroad, in the autumn of 1849, was in such degree forwarded, though incomplete, as to covet the business of transportation for the cotton-producers in the neighboring regions of Alabama and Tennessee — that there was an interest common to the three roads in tempting the cotton of those regions, through the channel of the Tennessee River and otherwise, to the line of transportation over their roads, instead of other channels which would lead the produce to the Gulf of Mexico — that Charleston and the South-Carolina Railroad Company, having long earnestly sought the object in question, even to that degree which led to large pecuniary contributions, had the greatest interest to secure, by some effectual arrangement at the terminus a quo, the starting-point, the progress of cotton to itself, and thus to Charleston, against the competition, for its diversion to some other point, at Atlanta, and also at Augusta. It may be, that these considerations would be insufficient to stamp the contracts of affreightment at Chattanooga, as the contracts, jointly, of the three roads. It might still be a case wherein the Western and Atlantic Railroad undertook to carry and cause to be carried, between the specified termini; that the consequent liability attached to that party only — that it would be governed by the maxim, respondeat superior, and would be the counterpart of the case of Muschamp vs. The Lancaster and Preston Junction Railway Company, 8 Mees. &. W. 421. It might still be, that the Western and Atlantic Road would, in fact and in law, be the contracting party, and the others should be reckoned servants or agents under them.
But when we advert to the “ advertisement” of the South-Carolina Railroad Company, when we remember that the other two roads, though not parties, expressly and in writing made public, thereto, yet systematically acted in conformity therewith, that the cars of the Georgia Road received the cotton at the *211 terminus a quo, and thus secured it against diversion at Atlanta, and the South-Carolina Road received the same at Hamburg or Augusta, and thus secured it against diversion there — that all this was done by virtue of the original contract of affreightment, without further stipulation with shipper or consignee — the preceding considerations acquire weight and substance; they furnish obvious, strong and adequate motives to lead the managers of the three railroads into a joint understanding and assumption of liability for the particular business specified in the advertisement. Connected with the practical execution of the business accordingly, they tend to show, that the other two roads stipulated, as the advertisement discloses, originally, or ratified subsequently. These views acquire the greater force, when they are urged by strangers to the contracting parties — by third persons. For there is equal reason to give such the same advantage of such a position, when the inquiry is as to a joint liability in character of joint-contractors, as when the inquiry concerns partnership touching the rights of strangers. To such, partnership is but joint liability.
Let us now resort, more particularly, to the terms of the advertisement.
It announces an arrangement between the three railroads resulting in a through ticket for cotton, at a rate in solido, from Chattanooga to Charleston. It may be conceded that a through ticket, in and of itself, would not create a joint liability further than an obligation on each of several independent carriers, to transport the subject-matter, to which it applied, over the entire line of transit, for a compensation already paid or promised for the whole line. It was then required that, in all cases, a duplicate receipt must be forwarded by mail to the agent of the South-Carolina Railroad Company at Hamburg, and the important words were added, “ in order to fix responsibility on this Company.” It seems incontrovertible, that when the duplicate was forwarded, the contemplated responsibility was fixed. The Georgia Road needed no such advice or paper from a shipper, because (as already stated) the cotton was on board its cars *212 from the first. What kind and degree of responsibility was to ensue upon the remitting by mail the duplicate receipt? Was it that of a common carrier, only when he received the cotton ? That begins only upon the receipt of goods or the acknowledgment of it. But this was expressly acknowledged to begin before. Was it the responsibility of a mere-forwarding agent, tendered in that distinct character, by the party who was also to be the carrier? Was it a mere scheme to supersede the occasion of an intermediate consignee or forwarding agent at Augusta or Hamburg ? If so, the shipper should have had the right to countermand at Augusta — to divert his cotton to Savannah- — or sell or otherwise dispose of it, in Augusta or elsewhere. How would that have answered the ends and the interests of the South-Carolina Railroad and of Charleston? How would the South-Carolina Railroad have received in Charleston, the freight already earned and expenses advanced ? Yet that was the course of the business. The freight, insólido, became payable when the cotton was delivered in Charleston, not before. Suppose the party here charged had acknowledged responsibility to be fixed when the duplicate receipt was forwarded by mail, and when the cotton was received, and according to its condition. Is it not palpable, ihat its transit to Charleston would not be secured — that the grand object would be liable to be frustrated ? If shippers were to understand that one of the Georgia Roads was exclusively an establishment of the State of Georgia, and therefore not amenable to action at law — quite beyond the powers of judgment and execution (and this has been said at bar to have been the condition of things in 1849)— and that they were to run all the hazards of loss and inadequate responsibility by porterage on drays between the Georgia and South-Carolina Railroads — ^-before any carrier had incurred an adequate and enforcible liability — they might, indeed, have hesitated to place a lot of cotton on a journey from Chattanooga to Charleston. It does appear most reasonable, that the “ responsibility” intended by the Company and justly understood by others to be intended by them, was beyond that of a mere *213 forwarding agent before the cotton actually came to its hands. Before that period, it is not easy to understand what other kind of responsibility than that of a carrier could, or should have been fixed on the Company by virtue of the advertisement. It is not an unreasonable source of a rule of construction, that one contracting party intended and knew that the other should and did understand him in a particular sense.
The practical construction of a contract by -the acts of a party sought to be charged, opens a fair source of light upon the just interpretation. For short delivery the South-Oarolina Railroad responded, in cases, it is presumed, where the default was not in that Company’s road. This was argued to have arisen from the receipt of the entire freight, as a correlative duty. It is not perceived why reimbursement for any other species of injury should not be estimated as of the same and equal obligation. Indeed something more than only such responsibility seems to have been Avithin the purview and natural scope of the words of the advertisement. They are : “ With these precautions the business can and will be transacted mutually satisfactory to all concerned. The Roads pledge themselves to give all practicable despatch to cotton entrusted to them for transportation.” The “ business” was an entire transit over the whole line. The pledge, for “ all practicable despatch,” was by the “ Roadsf not by each separately, and it was for cotton entrusted to “ the?n” — it is not said to them separately and successively. If the cotton ever was entrusted to the roads collectively, it was only Avhen received at the upper terminus. If the pledge of the roads for all practicable despatch shall have its natural meaning — it is a pledge of all for the despatch of each — and the same may be said as to the pledge, that the business should be transacted in a manner mutually satisfactory. Such views are not weakened by attributing another and concurring object in rigidly exacting the duplicate receipt, as, for example, that the South-Carolina Railroad should have convenient specifications of the cotton to facilitate its transportation from the depot at Augusta to that at Hamburg; and a notice of the quantity *214 coming forward, in convenient time to enable the Company to provide the motive power and cars requisite for proper expedition. The early receipt of the duplicate might well subserve these and such ends, while it should also fix the full liability of a carrier.
That a joint liability for all that was undertaken should have been intended by these Railroad Companies, is most reasonably to be inferred from terms that do not repel such construction, because it was a serious obstacle to a shipper at Chattanooga to find himself groping in the dark among three distinct carriers, with an inconvenient land porterage interposed, to fix the responsibility for default upon the real malfeasor, the more securely concealed from him, as well from the length of the line of transportation through two States, as from the want of agents to look after his interests or the expense and complication which would result from their procuration — the more especially in a business as yet new and unadjusted by experience. The obstacle would have been the greater, if it be, that one of the three hands who were to have custody of his cotton, pertained to a government to which insecurity is attributed as to ordinary modes of enforcing responsibility. The contract, as it has been interpreted, was apt, and perhaps indispensable, to remove such obstacle to a cherished and tempting adventure — and though the spirit may have been bold and the confidence inter sese strong that animated the Railroads in such an undertaking, yet the prize was glittering and they were eager to clutch it. However shockingly unjust it certainly is, to demand of one party a response for the misdeeds of another, or to lay on him the weight of another’s contract, yet the previous inquiry here is, Did the party sued enter the league with others named as confederates — and was that league lawful? and whenever he must say, in hcec fcedera veni, the shock to the moral sentiment vanishes, and the plain duty of a Court remains — to enforce the covenant, whatsoever the consequences.
That this was a question for the jury must, by this time, be abundantly manifest. It did not rest exclusively, or mainly, *215 on the contract of affreightment — nor upon any one or several written instruments, with no ambiguities suitable to open the door to oral testimony — but upon this latter kind of testimony as well. Reasons may be found in the case cited from 8 Mees. & W. 421, to vindicate the course on Circuit in taking the sense of the jury; which cannot be disturbed if there be reasonable evidence to support it, though the question be doubtful.
If, when viewed as between themselves, the South-Carolina Railroad has not made the joint-contract with the Georgia Roads, which the jury has found, as between the parties here litigant; or if one or both the Georgia Roads have entailed, by their misdeeds, a burthen on the exchequer of this defendant, we fail to perceive any plausible or reputable ground upon which the real wrongdoer shall refuse to assume his own proper burthen. That matter, however, we are not at liberty to discuss.
It is adjudged, that in each of these cases the motion be dismissed.
O’Neall, Wardlaw, Glover and Munro, JJ., concurred.

Motion dismissed.